**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **GERALD DEAN MORGAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **JURY DEMANDED** |
| | ) | |
| **v.** | ) | **Case No. 3:21-cv-00274** |
| | ) | |
| **BOARD OF PROFESSIONAL** | ) | **Judge Waverly D. Crenshaw, Jr.** |
| **RESPONSIBILITY OF THE** | ) | |
| **SUPREME COURT OF TENNESSEE,** | ) | **Magistrate Judge Chip Frensley** |
| **And SANDRA GARRETT, in her** | ) | |
| **Individual capacity,** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS**

---

### INTRODUCTION

This case involves the wrongful termination of an excellent attorney who performed his job in an exemplary fashion, worked in complete harmony with each of his co-workers, regularly appeared before the Supreme Court of Tennessee – winning seven of his eight cases there – and received exclusively glowing feedback from his supervisors. Despite his indisputable success as an employee, he was wrongfully terminated from his public employment, not for any misconduct on the job, for causing a disruption in the workplace, or anything related to his status as an attorney.

Instead, he was terminated for tweets which 1) occurred years prior to his public employment, 2) were purely political in nature; 3) commented on matters of public concern; 4) expressed a political view that is shared by the majority of Tennesseans; 5) did not impact his ability to perform his job; and 6) had nothing to do with the practice of law. Those years-old tweets were published by a disgruntled, and suspended, Tennessee attorney who the Supreme

Court of Tennessee has found poses a "substantial threat of harm to the public." That attorney, who could not – and did not – complain of any unfair treatment from Mr. Morgan, filed those tweets in a meritless motion to disqualify in an effort to embarrass the Board of Professional Responsibility ("the Board").

Despite the fact that no complaint (either internal or external) had been raised against Mr. Morgan, the Board and Ms. Garrett terminated Mr. Morgan, knowing without doubt that his work exceeded expectations, and recognizing that disgruntled attorneys will often lash out at the Board without justification in order to conceal or downplay their own misconduct. While terminating Mr. Morgan based on the motion to disqualify, the Board simultaneously stated to the court that the motion had no merit, did not allege any wrongdoing on the part of Mr. Morgan, and did not demonstrate any bias at all.

It cannot be gainsaid that the protection of the right to speak on matters of public concern free of government restraint or retaliation is central to the existence of a free and democratic society. Political ideas do not carry with them an imprimatur of truth. They should stand on their own.

We hope to discover "truth" from reason. Argument is the cauldron for ideas. Argument is not only healthy to a democracy, it is essential because in a free society we will not all agree.

Mr. Morgan regarded radical Islam as a threat to American interests. This is a threat widely accepted after 9/11. The Patriot Act was a manifestation of real concerns. In order to judge Jerry Morgan a "bigot", it was necessary that the Board of Professional Responsibility interpret and characterize his remarks. In other words, this agency of the state was required to take sides.

This the First Amendment forbids it to do.

The motion filed to disqualify Mr. Morgan from the case of Brian Manookian did not seek his termination. The Board itself argued that there were insufficient grounds to require the removal of any disciplinary counsel. Judge William Acree agreed.

Mr. Morgan was fired because he publicly supported views consistent with and in support of those endorsed by Donald Trump and the national Republican Party. That he commented on matters of public concern is a fact in the context of this Rule 12 motion. The Defendants do not dispute this fact "for purposes of this motion," but would be hard pressed to make such an attempt in any event.

Nor do the Defendants argue Mr. Morgan to have been insubordinate, or to have been a disruption within the office of disciplinary counsel. He was fired without accusations of any kind aside from his publicly expressed political views.

The Twitter posts of 2015-2016 were made prior to Mr. Morgan's employment and before Mr. Manookian had married a woman of the Muslim faith. Mr. Manookian did not claim that he was a Muslim himself. The case assigned to Plaintiff was an appeal. The case concerned allegations of inappropriate conduct of Mr. Manookian toward opposing counsel and judges. None of the circumstances of the case had anything to do whatsoever with religion.

It is not for the courts to judge the merits of a particular public expression of opinion. As stated by the U.S. Supreme Court in *Connick v. Myers*, 461 U.S. 138, 145, 103 S. Ct. 1684, 75 L. Ed. 708 (1983): "**speech concerning public opinion is more than self-expression, it is the essence of self-government. Speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection**."

The Defendants have conditioned Mr. Morgan's public employment on the context of his political speech. While the Board and Ms. Garrett may have taken umbrage at the opinions of Mr.

Morgan, a majority of Tennesseans and a minority of several million across the country agreed with him.

<u>**STATEMENT OF FACTS**</u>

On February 1, 2019, Plaintiff Gerald Morgan began his employment with the Board of Professional Responsibility of the Supreme Court of Tennessee. Complaint ("Comp.") ¶ 3. He was hired to serve as Disciplinary Counsel for the Board. Comp. ¶ 3. His primary responsibilities included the handling of all appeals, including appeals before the Supreme Court of Tennessee. Comp. at ¶ 9.

Mr. Morgan was assigned an appeal filed by attorney Brian Manookian. Comp. ¶ 9. Mr. Manookian was then and remains the subject of numerous complaints filed against him by attorneys and judges alleging unethical behavior. Comp. ¶ 9. Mr. Manookian has been suspended for several years by the Supreme Court, which found that he posed a threat of substantial harm to the public. Comp. at ¶ 10.

On May 20, 2020, after a trial handled by another attorney for the Board, a hearing panel recommended a two (2) year active suspension of Mr. Manookian's license to practice law. Mr. Morgan was not involved in that trial or any other prosecution of Mr. Manookian up to that time. Comp. at ¶ 11. However, when Mr. Manookian appealed, the appeal was assigned to Mr. Morgan. Comp. at ¶ 9.

Mr. Manookian, through his counsel Daniel Horwitz, filed a motion to stay the appeal, which was heard, and denied, by Senior Judge William Acree on November 23, 2020. Comp. at ¶ 12. The following day, Mr. Horwitz filed a Motion to Disqualify Mr. Morgan, claiming that he was an "anti-Muslim bigot." Comp. at ¶ 13. In support of that argument, Mr. Horwitz, on behalf of Mr. Manookian, attached numerous political tweets dating back to the presidential campaign

from 2015-2016 between Donald Trump and Hillary Clinton. Comp. ¶ 13. As Mr. Morgan was not an employee of the state or the Board until 2019, those political tweets predated his state employment by 3-4 years. Comp. ¶ 13.

Mr. Horwitz, on behalf of Mr. Manookian, claimed that the political tweets demonstrated that Mr. Morgan had an anti-Muslim bias. Comp. at ¶ 15. Mr. Manookian claimed that *his wife* was a Muslim and that his children "are being raised in a Muslim household." Comp. ¶ 15. Mr. Manookian did not claim that Mr. Morgan had actually treated him unfairly, or that Mr. Morgan even knew Mr. Manookian's wife or had ever met her. Comp. ¶ 15. Nor did Mr. Manookian claim in the motion to disqualify that Mr. Morgan had violated any of the Tennessee Rules of Professional Conduct or had acted with any unfair bias toward himself or anyone else. Comp. at ¶ 16.

Mr. Morgan has never met Mr. Manookian, and has never communicated with him, whether through letter, phone call, email, or any other manner. Comp. at ¶ 17.

The tweets at issue were purely political in nature. Comp. at ¶ 18. They discussed topics which were indisputably part of the national discussion during the presidential election, and were hotly debated between candidates Trump and Clinton. Comp. at ¶ 19.

On December 11, 2020, Mr. Morgan was notified of his termination during a phone call with Chief Disciplinary Counsel Sandy Garrett, Counsel for the Court Rachel Harmon, and Stephanie Holliday, Human Resources Manager for the Administrative Office of the Court. Comp. at ¶ 20. Ms. Garrett gave Mr. Morgan the "Hobson's choice" of either resigning effective immediately, or being terminated. Comp. Exhibit A. Ms. Holliday provided a termination memorandum to Mr. Morgan, who was required to sign it by the end of the day or the

choice to "resign" would no longer be available, and the termination would be effective. Comp. Exhibit A.

The termination memorandum indicated that Mr. Morgan had a duty to protect the public by investigating and prosecuting cases "without discrimination or bias." Comp. Exhibit A. Yet, the memorandum failed to identify any claims or circumstances in which Mr. Morgan had not fulfilled that duty, and there were absolutely no accusations otherwise. Comp. at ¶ 20.

While the memorandum disingenuously acknowledged Mr. Morgan's "right to free speech," the memorandum made clear that Mr. Morgan was being terminated for the exercise of that very right. Comp. at ¶ 22. No misconduct on the part of Mr. Morgan has been alleged at any time, and none existed. Ms. Garrett and the Board were very aware of this. Comp. at ¶ 22.

On December 11, 2020, the same day Ms. Garrett terminated Mr. Morgan, the Board filed a memorandum in opposition to Mr. Manookian's motion to disqualify. Comp. at ¶ 23; Comp. Exhibit B. In that memorandum, the Board affirmatively stated that Mr. Manookian "has neither *alleged* nor produced any statement, pleading or conduct by the undersigned Disciplinary Counsel *or any counsel employed by the Board*, demonstrating or suggesting this disciplinary action has been influenced by bigotry, race, religion or other arbitrary classification." Comp. Exhibit B (emphasis added). The Board further argued that there was nothing in the motion to disqualify that justified removal of Board counsel from the case. Comp. at ¶ 25.

In other words, the Board made clear to a court of record that Mr. Manookian had not even *alleged* any sort of misconduct at all on the part of Mr. Morgan, and that the motion to disqualify was without merit. Instead, the motion to disqualify simply accused Mr. Morgan of *thinking* incorrectly, namely having a politically conservative position.

6

Despite the Board's clear affirmative statements that there were no allegations of misconduct by Mr. Morgan, and that the motion to disqualify was insufficient to even justify removing any disciplinary counsel from the Manookian case, the Board found it sufficient to terminate Mr. Morgan's employment. Comp. at ¶ 26.

Mr. Morgan's work for the Board was exemplary, and he had never been accused of acting with unfair favoritism, bias or ethical violation. Comp. at ¶ 27. In his seventeen (17) year career as an attorney, Mr. Morgan has never been accused of violating any ethical rules. Comp. at ¶ 28. Prior to the filing of Mr. Manookian's motion to disqualify, which the Board itself argued was meritless, the Board, and Ms. Garrett, had consistently praised Mr. Morgan's work. Comp. at ¶ 29.

On March 1, 2021, almost four (4) months after his wrongful termination, Ms. Garrett sent Mr. Morgan a letter notifying him that the Board had opened a disciplinary file against him. Comp. at ¶ 30; Exhibit C. The letter included another copy of the motion to disqualify, which the Board itself had represented to the court was not only without merit, but also lacked any *allegations* of misconduct against Mr. Morgan. Comp. at ¶ 24. Despite the absence of a single accusation of an ethical violation, without any complaint being filed against him, and contrary to the Board's own statements in response to the motion to disqualify, Ms. Garrett opened a disciplinary file, giving Mr. Morgan ten (10) days to respond or face potential suspension. Comp. at ¶ 32; Exhibit C.

Of course, because there had been no allegation of misconduct and no complaint filed, the letter did not (and could not) inform Mr. Morgan of any allegations to which a response was required, or any Rules of Professional Conduct that he had been accused of violating. Comp. at ¶ 34. Nonetheless, the Board opened disciplinary File No. 66789-6-ZZ against him. Comp. at ¶

7

34.  On March 29, Mr. Morgan was informed that the disciplinary matter, at least for the time being, had been dismissed.  Comp. at ¶ 35.

Mr. Morgan filed his Complaint on April 5, 2021, claiming wrongful termination.  Specifically, Mr. Morgan seeks injunctive relief against the Board and money damages against Ms. Garrett for violating his clearly established constitutional rights, privileges and immunities.  On May 3, 2021, the Board and Ms. Garrett filed their Motion to Dismiss and Memorandum in Support thereof.

## STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).  This standard is met when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*.

"In reviewing a motion to dismiss, we construe the complaint in the light most favorable to the plaintiff, draw all reasonable inferences in its favor, and accept all well-pleaded allegations in the complaint as true."  *Keene Grp., Inc. v. City of Cincinnati*, 2021 U.S. App. LEXIS 15074, at * 5 (6th Cir. 2021) (*citing Cahoo v. SAS Analytics, Inc.*, 912 F.3d 887, 897 (6th Cir. 2019)).

## ARGUMENT

Defendants argue in their Memorandum that the Complaint against the Board should be dismissed based on Eleventh Amendment sovereign immunity; that the Complaint against Ms. Garrett in her individual capacity should be dismissed based on absolute quasi-judicial immunity;

and, dismissed against Ms. Garrett in her individual capacity based on qualified immunity. None of the arguments have merit, and the Motion to Dismiss should be denied.

## I.    THE ELEVENTH AMENDMENT DOES NOT BAR CLAIMS AGAINST THE BOARD FOR PROSPECTIVE EQUITABLE RELIEF

The Board begins its defense by arguing that the Eleventh Amendment "bars actions in federal court against a state." The Board states that "[t]he State of Tennessee has not waived its Eleventh Amendment immunity and *cannot be sued in civil rights suits, even for injunctive relief.*"

The Board relies on two primary cases for its argument: *Sallee v. Board of Professional Responsibility*, 2015 WL 2374230 (2015) and *Will v Mich. Dep't of State Police*, 491 U.S. 58, 71, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989). *Sallee* is a non-binding Eastern District of Tennessee case brought by a pro se plaintiff who failed to respond timely to the Board's motion. The Board extrapolates this statement from *Sallee*: "Tennessee has not waived its immunity under the Eleventh Amendment with respect to civil rights suits and cannot be sued, even for injunctive relief." *Id.,* at *18.

The Board fails to point out that this statement from *Sallee* is directly contrary the holding in *Will*. Unlike the non-binding *Sallee*, *Will v. Mich. Dep't of State Police,* a United States Supreme Court case, is certainly binding on this Court. The Board cites *Will* for the proposition that "[n]either a state nor its officials acting in their official capacities are 'persons' subject to suit under 42 U.S.C. § 1983."

But the Board simply ignores fn. 10 of the *Will* case, which explicitly states: "Of course a state official in his or her official capacity, when sued for injunctive relief, *would be* a person under § 1983 because 'official-capacity actions for prospective relief *are not* treated as actions against the state.'" *Will v Mich. Dep't of State Police*, 491 U.S. 58, 71, n. 10, 109 S. Ct. 2304, 105 L. Ed.

2d 45 (1989) (emphasis added) (*citing Kentucky v. Graham,* 473 U.S. 159, 167, n. 14 (1985); *Ex Parte Young*, 209 U.S. 123, 159-60, 28 S. Ct. 441 (1908).

The Board fails to explain why it ignored that clearly relevant – and directly on point – statement from the Supreme Court.

Moreover, the notion in the non-binding *Sallee* that the Eleventh Amendment bars claims against the state for injunctive relief is directly contradicted by *Moncier v. Jones*, 557 Fed Appx. 407, 2014 U.S. App. LEXIS 2014, 2014 WL 463463 (6th Cir. 2014), another *binding* case cited by Defendants. While the Board references *Moncier* in its argument regarding quasi-judicial immunity, it ignores *Moncier's* finding that "the Eleventh Amendment *does not bar* official-capacity claims for prospective equitable relief against state officials." *Id*. at 409 (*citing Will,* n. 10) (emphasis added).

*Sallee* is also contrary to other 6th Circuit cases which uphold the *Will* exception. For example, *Kuot v. Corr Corp. of Am.*, 2016 U.S. Dist. LEXIS 37009, at *30 (2016) held that "insofar as the petitioner seeks prospective injunctive relief against the state officials in their official capacity, his claims are not barred by the 11th Amendment or sovereign immunity.")

Mr. Morgan requested a permanent injunction restraining the Board from taking any adverse action against him as a result of his protected speech. Comp. Prayer for Relief, ¶ 4. While the faux disciplinary file opened against him was dismissed, there appears to be nothing in Tenn. Sup. Ct. R. 9 prohibiting the Board and Ms. Garrett from opening the file again. As the first file was opened without the slightest justification, Mr. Morgan has no confidence in the Board or Ms. Garrett's discretion to believe that another file one would not be opened based on the same constitutional violations. Mr. Morgan further requested a mandatory permanent injunction requiring the Board to expunge all reference to the disciplinary file which was wrongly opened

from its internal computer tracking systems. Mr. Morgan further seeks an injunction prohibiting the Board from communicating to any third party that Mr. Morgan was terminated based on allegations of bigotry.

The Board's position that the Eleventh Amendment bars even equitable relief against the Board is simply incorrect. Mr. Morgan seeks no monetary award against the Board. He seeks only prospective equitable relief. His claim is therefore plainly not barred by the Eleventh Amendment.

## II.   MS. GARRETT IS NOT ENTITLED TO QUASI-JUDICIAL IMMUNITY IN HER INDIVIDUAL CAPACITY

Next, the Board argues that Ms. Garrett is entitled to quasi-judicial immunity in her individual capacity. The Board admits that "[a]ny actions she took with respect to Plaintiff, including but not limited to his separation of employment and the opening of a disciplinary matter against him, were intimately associated with or related to the Motion to Disqualify filed against Plaintiff in a pending disciplinary appeal proceeding involving another attorney and/or complaints asserted against Plaintiff in his position as Disciplinary Counsel in Board disciplinary proceedings."

First, the Board cannot honestly claim that Ms. Garrett relied on any complaints asserted against Mr. Morgan in the Motion to Disqualify, because the Board itself, in its response to the Motion to Disqualify, plainly stated that Mr. Manookian did not even *allege* misconduct or bias. In other words, there *were no* "complaints asserted against Plaintiff… in Board disciplinary proceedings," by the Board's own admission.

Second, no complaint has ever been filed against Mr. Morgan. The only "disciplinary matter" opened against Mr. Morgan was initiated by Ms. Garrett herself over three (3) months after the wrongful termination. That "disciplinary matter" was completely bereft of any legal basis. It hardly requires mentioning that Ms. Garrett, in wrongfully terminating Mr. Morgan in

December of 2020, could not rely on a faux "disciplinary matter" which was not even opened until March of 2021, and even then was completely without justification.

But the fundamental flaw in the Defendants' argument for quasi-judicial immunity is that it is based merely on Ms. Garrett's title and not the function being performed in this case, which deprived Mr. Morgan his First Amendment rights. In fact, no real effort has been made in the Defendants' brief to discuss these well-established distinctions, specifically those related to employment decisions.

It is correct that officials who perform duties that are essentially judicial in nature have been held entitled to immunity. The cases cited by the Defendants plainly involve decision making of an adjudicative nature. *Quatkemeyer v. Kentucky Bd. Of Med. Licensure*, 506 Fed. Appx. 342, 2012 U.S. App. LEXIS 24197, 2012 FED App. 1205N (6th Cir. 2012) and *Watts v. Burkart*, 978 F.2d 269 (6th Cir. 1992) involved medical licensing boards rendering disciplinary decisions based on hearings, proof and deliberations. In both of those cases, the state officials were no doubt acting as prosecutors, clearly an adjudicative function.

The same was true in *Moncier*, *supra*, which directly involved performance in the role of disciplinary counsel. Likewise, in *Manookian v. Flippin*, No 3:19-V-00350, 2020 WL 978638 (M.D. Tenn. Feb. 28, 2020), the Board was entitled to quasi-judicial immunity because the alleged conduct was squarely within its adjudicative role.

The Defendants' brief, however, ignores the well-established rule that quasi-judicial immunity does not attach merely to the identity of the actor who performed the challenged conduct. Instead, the court must look to the function performed. *Quatkemeyer*, 506 Fed. Appx. at 346.

12

Conduct involved in the hiring and firing of employees has long been held to be an *administrative* function to which no immunity may attach. Remarkably, this rule has been applied even to judges themselves who performed a mere administrative function in firing a clerical employee. As stated in *Guercio v. Brody*, 814 F.2d 1115 (6th Cir. 1987): "Members of the judicial, legislative, and executive branches routinely engage in the task of hiring and firing confidential personnel. This is an administrative act common to all branches of government and the private sector, not the type of act normally performed *only* by judges." *Id*. at 1119 (internal quotations omitted).

This has been described by the Supreme Court as the "functional approach." *Forrester v. White*, 484 U.S. 219, 224, 98 L. Ed. 2d 555, 108 S. Ct. 538 (1988). Only tasks so integral or "intertwined" with the judicial process may claim immunity. Administrative acts unrelated to judicial proceedings are not entitled to quasi-judicial immunity. *Bush v. Rauch,* 38 F.3d 842, 847 (6th Cir. 1994), *Watts*, 978 F. 2d 269 (6th Cir. 2012).

As with its argument on the Eleventh Amendment, the Board cites particular cases while ignoring inconvenient holdings from those very cases. While the Board cites *Quatkemeyer*, *supra* at 506 Fed. Appx. 346, the Board fails to acknowledge this statement from the same case: "Quasi-judicial immunity extends to those persons performing tasks so integral or intertwined with the judicial process that these persons are considered an arm of the judicial officer who is immune." *Id*. at 346 (*citing Bush,* 38 F.3d at 847). "The Supreme Court has endorsed a 'functional approach in determining whether an official is entitled to absolute immunity. Under this approach, a court 'looks to' the nature of the function performed, not the identity of the actor who performed it.'" *Quatkemeyer*, 506 Fed. Appx. at 346 (*citing Collyer v. Darling*, 98 F.3d 211, 221 (6th Cir. 1996).

The claim against Ms. Garrett arises from the *administrative* decision to terminate an employee based on nothing but his years-old expression of political opinions on matters of public concern. Ms. Garrett made this clear in her termination memorandum: "*Your speech* has adversely impacted your ability to successfully perform your job duties." Mr. Morgan was never the respondent in any disciplinary hearing or appeal, as no complaint had ever been filed against him when the termination memorandum was delivered. Ms. Garrett made a choice among *administrative* options. There was no appeal available to the Plaintiff and no pre-termination hearing available to him.

Ms. Garrett is not entitled to immunity merely because she is an employee of a court.

## III.  MS. GARRETT IS NOT ENTITLED TO QUALIFIED IMMUNITY IN HER INDIVIDUAL CAPACITY

"Qualified immunity is an affirmative defense that shields government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Rogers v. Gooding*, 84 Fed. Appx. 473, *3, 2003 WL 22905308 (6th Cir. 2003) (*citing Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L.Ed.2d 396 (1982)). "A court in this circuit undertaking a qualified immunity analysis must first determine whether the plaintiff has alleged a violation of a constitutionally protected right; if so, the court must examine whether the right was clearly established at the time of the alleged violation." *Id*.

"Qualified immunity is an officer-friendly doctrine, designed to ensure that police, who have to make snap judgments to protect themselves and others in uncertain conditions, will not face undue Monday-morning quarterbacking from courts afterward." *Williams v. City of Flint*, 814 Fed. Appx. 973, 979, 2020 U.S. App. LEXIS 16076, 2020 FED App. 0278N (6th Cir. 2020).

If the facts are unclear, the jury must initially decide which view of the facts to accept. *Brandenburg v. Cureton*, 882 F.2d 211, 216, 1989 U.S. App. LEXIS 11901 (6th Cir. 1989). Only then will the court be able to determine if the official is entitled to qualified immunity. *Id*. "Such cases and their disposition reflect our longstanding rule that 'where the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability.'" *Green v. Throckmorton*, 681 F.3d 853, 864 (6th Cir. 2012) (*quoting McKenna v. Edgell*, 617 F.3d 432, 437 (6th Cir.2010) (internal quotation marks omitted)).

## A. Violation of a Constitutionally Protected Right

The first step in the analysis is determining if plaintiff has identified a violation of a constitutional right. According to the Complaint, Mr. Morgan alleges that his First Amendment freedom of speech has been violated.

"To assess whether a public employer impermissibly retaliated against an employee for his speech, we ask three questions: one, whether the employee engaged in protected speech; two, whether the action taken against the employee would discourage an individual of 'ordinary firmness' from engaging in the activity that led to his discipline; and three, whether the employee's protected speech was a 'motivating factor' behind the adverse action taken against the employee." *Marquardt v. Carlton*, 971 F.3d 546, 549, 2020 U.S. App. LEXIS 26355 (6th Cir. 2020).

### 1. Protected Speech

As the Board acknowledges, in order to determine whether the discharge of a public employee violates the First Amendment, the court applies a two-step analysis. First, the court must determine if the employee's speech involved a matter of public concern. *Connick v. Myers*,

461 U.S. 138, 149-50, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983). In the event the court finds the employee's speech involves a matter of public concern, then the court is to apply the *Pickering* balancing test, weighing the employee's interest in commenting upon matters of public concern "and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. Of Educ.*, 391 U.S. 563, 568, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968).

Here, the Board essentially concedes that the speech at issue was on a matter of public concern. The tweets from 2015 and 2016 were written in the midst of a presidential election and clearly addressed immigration policies being debated between the two primary presidential candidates. This threshold has undoubtedly been met, meaning the Court is to look to the *Pickering* test and balance the employee's interest in commenting on matters of public concern and the employer's interest in promoting the efficiency of the public services it performs.

As explained by the Supreme Court in *Rankin v. McPherson*, 483 U.S. 378, 388, 107 S. Ct. 2891, 97 L. Ed. 2d 315 (1987), "the statement will not be considered in a vacuum; the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose." *Id*. "We have previously recognized as pertinent considerations whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Id*.

Discussing the balancing test, the Board simply claims that Ms. Garrett *could properly determine* that Mr. Morgan's First Amendment right to speak was outweighed by the Board's mission, and that the twitter posts affected Mr. Morgan's position as one of public trust, and affected the Board's ability to effectively serve the public. The Board states that "Disciplinary

Counsel in the State of Tennessee have a duty to protect the public by investigating and prosecuting disciplinary proceedings without discrimination or bias." While that is certainly true, the Board ignores the undeniable fact that Mr. Morgan *had investigated and prosecuted without discrimination or bias*, had never been accused otherwise, and that the Board itself admitted as much in its response to the meritless motion to disqualify.

It is beyond dispute that Plaintiff successfully and fairly performed his job duties at all times for the Board, and that he had worked for some time in 2019 and 2020, several years following the twitter posts concerning Donald Trump's views on Muslim travel to the United States, without the slightest incident. The Board's decision to remove him from Manookian's case was hardly "required," as stated by Mr. Russ Willis in his argument to the court. It was, respectfully, a craven concession to a lawyer facing discipline for allegedly having threatened fellow lawyers and judges.

The Board avoids *Rankin's* directive that "the context in which the dispute arose" must be taken into account. The specific context here is that Mr. Manookian, deemed by the Supreme Court of Tennessee to be a "threat of substantial harm to the public," had already been suspended for lengthy periods of time, had engaged in legal warfare with the Board and numerous Tennessee judges and attorneys, and had every incentive to try to embarrass the Board. Of equal importance are the unavoidable facts that Mr. Morgan had never communicated with Mr. Manookian in any way, that religion had nothing to do with Mr. Manookian's numerous disciplinary cases, and that the Board itself admitted on the record that Mr. Morgan had never acted with any sort of discrimination or bias toward him.

Without any actual facts to assist them in the *Pickering* analysis, the Defendants seek to focus on public perception and the amorphous claim that Mr. Morgan's years-old tweets could

somehow harm the Board's mission.  There is no evidence, however, that public perceptions might plausibly be said to have disrupted the Board's work, most of which is done in secrecy.  Indeed, the Board's files are exempt from Tennessee's open records laws. Tenn. Sup. Ct. R. 9, § 32.

Although plaintiff posted in both the 2016 and 2020 election cycles, the Board and Ms. Garrett focused on his support in 2015 and 2016 of denying entry to people from Muslim countries allegedly supporting extremists.  It was his motivated characterization as a "bigot" that led to Mr. Morgan's termination because of the notion that a mere allegation of bigotry might endanger the mission of the commission.

It is the conduct of the Board and Ms. Garrett, however, that most directly threatened the reputation and mission of the Board.

This court and indeed the entire country are aware that the United States was violently attacked in 2001 by Muslim extremists who had been allowed into the United States.  The United States went to war in Afghanistan, the longest war in American history, directly in response to this attack. We invaded Iraq, many think unwisely, for the same purpose. We honor those men and women who served in those theaters as heroes protecting our homeland.

Donald Trump exploited the anger and resentment emanating from that tragedy and other events. He and his supporters viewed the idea of limiting travel from some countries as strong, logical, and necessary to protect the homeland.  Others viewed this position in the context of Mr. Trump's intemperate language regarding Hispanic people and his pandering to homophobia as an indication of bigotry.

The Board now has not only blundered into this political dispute; it has chosen a side. Millions of citizens, and a majority of Tennesseans chose Mr. Trump in 2016.  The Board and Ms. Garrett have therefore not only improvidently entered into a political controversy, they have

18

chosen the minority side in our state. The Board has argued in its motion that its mission and reputation were threatened by words uttered by a man not even employed by it when made. According to the Board, future litigants *might* contend that Mr. Morgan *might* let his political opinions interfere with his handling of cases, even though there is no evidence at all that he had done so in the past.

Because the Board and Ms. Garrett chose a side in a political contest, it has now made inevitable the raising of this question: may a lawyer who has publicly agreed with Mr. Trump and Jerry Morgan receive fair and unbiased treatment from Ms. Garrett and the Board of Professional Responsibility? It should be evident that a Trump supporter is far more likely than a Muslim attorney to come before the Board of Professional Responsibility in Tennessee.

It must also be recognized that the general public is hardly aware of the Board and its operations. While the legal community is certainly aware of the Board, that community is generally sophisticated enough to recognize Mr. Manookian's tactics for what they were – a cynical and meritless libel against the Board and Mr. Morgan.

The Board's position appears to be that if the public became aware that one of the Board's disciplinary counsel, back in 2015 and 2016, agreed with former President Trump's immigration position involving Muslims from Islamic terrorist hotspots, then the Board's current mission, and its reputation, would be harmed. Accordingly, in the Boards' view, the state of Tennessee cannot countenance having one of its public employees holding such views. In reaching this conclusion, the Board acquiesced to the "heckler's veto", which occurs when the police silence a speaker to appease a potentially hostile crowd. *Bible Believers v. Wayne County*, 805 F.3d 228, 234, 2015 U.S. App. LEXIS 18745 (6th Cir. 2015). In order to avoid the *possibility* that some unidentified

19

members of the public would be offended by such beliefs, the Board simply silenced them. Such a "heckler's veto" has been repeatedly condemned as unconstitutional. *Id*. at 252.

Had the Board simply contested the motion to disqualify not just on its own behalf but also on behalf of Mr. Morgan, this "public perception" would have never taken hold, as the Board would have made clear that it stood behind its disciplinary counsel in the absence of actual allegations of misconduct or unfair treatment. But by responding the way it did, defending against the motion only for itself while casting Mr. Morgan out, the Board allowed the "public perception" to become the reality. Far from "saving" the Board from feared negative connotations, the Board created them.

The *Pickering* test does not favor the Board's actions in this matter. Mr. Morgan's speech from years prior to becoming a public employee had no impact on his ability to do his job, did not cause the slightest disruption in the office, and had no bearing on the Board's mission.

### 2. Discouragement of persons of "ordinary firmness"

With the Board's actions in terminating Mr. Morgan based on nothing more than his speech which occurred years prior to his public employment, there is no legitimate dispute that such actions would discourage a person of "ordinary firmness" from engaging in such political speech. The Board, while referencing the three part test from *Gillis v. Miller*, 845 F.3d 677, 684 (6th Cir. 2017) fails to discuss this second part of the test at all.

The Board terminated Mr. Morgan without any complaint about his work, about his handling of any case, without any ethical violations, and in spite of his excellent performance. This unjustified adverse action could easily discourage others in public employment from speaking. If the Board's actions are allowed to stand unchecked, then all public employees in the state of Tennessee will be forced to comb back through years of their social media in an effort to scrub out

anything that *the state* might deem offensive, regardless of how remote such speech was in relation to their status as public employees, and without any showing that such speech impacted their ability to perform their jobs or had any effect on harmony amongst their coworkers.

### 3. Motivating factor

Finally, the Court must determine if the protected speech was a motivating factor in the adverse action. This element is expressly admitted in the Board's termination memorandum of December 11, 2020. Compl., Exhibit A. The Board specifically stated that "[w]e acknowledge and respect your right to free speech. However, your speech has adversely impacted your ability to successfully perform your job duties." With such language, the Board itself drew a straight line between the protected speech and the adverse action.

### B. The Right Was Clearly Established

Once the Court finds a violation of a constitutionally protected right, the Court moves to the second step in the qualified immunity analysis, namely to determine if the constitutionally protected right was "clearly established" at the time of the violation.

"The right allegedly violated cannot be asserted at a high level of generality, but, instead, must have been clearly established in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Rogers,* 84 Fed. Appx. at *3 (*citing Anderson v. Creighton*, 483 U.S. 635, 639-40, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). "As the Supreme Court explained in Harlow, the reasonable person, in this instance, is a reasonably competent public official who should know the law governing his conduct." *Id*.

Not only was the right to free speech "clearly established," it was specifically referenced by the Board in the termination memorandum. The Board, denying that Ms. Garrett violated Mr.

Morgan's clearly established rights, simply claims that Ms. Garrett "made good faith decisions squarely within United States Supreme Court and Sixth Circuit Court of Appeals precedent." Yet the only citation provided by the Board in support of such a sweeping proposition is *Bennett v. Metro Gov't. of Nashville & Davidson Cty., Tennessee*, 977 F.3d 530 (6th Cir. 2020). Even a cursory review of *Bennett* demonstrates its inapplicability.

Ms. Bennett worked for Metro Nashville's Emergency Communications Center ("ECC") as an emergency telecommunicator, fielding emergency calls, and she was certified in emergency medical and fire dispatch. *Id.* at 533. While awaiting the results of the 2016 election, she posted on Facebook, in part: "even niggaz and latino's voted for Trump too!" *Id.* at 534.

The overtly offensive nature of this comment could hardly be denied. Ms. Bennett's Facebook profile identified her as a Metro Police Department and ECC employee. Other co-workers were offended but Bennett refused to apologize for the comment. *Id.* at 533.

The following morning after her Facebook posts were made, the general public became aware of the posting and began commenting, and numerous complaints were filed with Metro. *Id.* at 534. Further, ECC and Metro employees began issuing complaints as well, including many directly to the Mayor's office. *Id.* Metro Human Resources reported that there was "general discomfort" and things were not "harmonious like they normally are." The chief union steward relayed complaints, describing a great deal of tension in the call center, recommending diversity training for employees and advocating having a counselor come to the office to speak with the employees. *Id.* at 535. In addition, Ms. Bennett was accused of violating three Metro Civil Service Commission policies due to her racially charged language. *Id.* at 536.

The jury found that her post likely had a detrimental impact on close working relationships and that she had violated policies. *Id.* at 537.

It should be noted that Ms. Bennett's speech, contrary to that of Mr. Morgan's, was found to have been not entirely political. Nonetheless, the court applied the *Pickering* balancing test (*Id.* at 537-45) in ways plainly distinguishable from the present case.

The court found that Ms. Bennett's offensive language had adversely impacted harmony in the workplace and had a detrimental impact on working relationships in the office. *Id.* at 540. There are no such considerations in this case. There was also a clear public outcry against Ms. Bennett, while there is no such thing here.

While the Board cites to the *Pickering* test and admits the application of "time, place and manner" as required by *Rankin*, beyond speaking in hypotheticals, it wholly fails to apply the test to the facts as they existed. As for the "time," the Board makes no reference to the fact that the tweets at issue occurred four (4) years *prior* to Mr. Morgan becoming a state employee. The "place" of the tweets also does not help the Board, as they were not made at Mr. Morgan's place of employment, and had absolutely no connection to his public position, which he did not have at the time. Regarding the manner, unlike *Bennett*, Mr. Morgan's twitter account at no point identified him as a public employee, as disciplinary counsel for the Board, or otherwise.

Unlike the events in *Bennett*, the Board has not even attempted to demonstrate any sort of disruption in the office, any complaints from the public, or anything else that would compare this case to *Bennett*. The Board avoids this, because there was none.

Given the strong protections the First Amendment provides to speech in the context of presidential elections, it is wholly wrong to conflate Ms. Bennett's actions – using a racial slur universally understood as such while a public employee on a platform in which her public position was made prominent, and which caused public outcry as well as severe disruption in her place of employment – with Mr. Morgan's comments agreeing with a candidate for president made years

prior to his hiring by the public agency on a platform which did not indicate his public position, which he did not have at the time, and which did not cause the slightest public outcry or disruption in the office.

While Ms. Garrett attempts to claim qualified immunity, she is not a police officer forced to make a split-second decision with life and death consequences, under great stress, for whom the privilege was intended. She is a trained, experienced and capable lawyer, charged with knowledge of the law. And the law was well established at the time of Mr. Morgan's termination, including in cases cited in the Defendants' memorandum: public employees have a First Amendment right to speak on matters of public concern.

Ms. Garrett, on behalf of the Board, made the decision to terminate Mr. Morgan based solely on his protected speech. The separation memorandum of December 11, 2020 (Compl. Ex A) confirms the motive by specific reference to "posts you placed on Twitter." Paradoxically, the memorandum acknowledges and expresses faux respect for Mr. Morgan's "right to free speech". This decision, far from being a split-second one involving life and death which qualified immunity is designed to protect, was made after a three week "investigation."

The Complaint alleges – accurately – that "no misconduct of any kind was alleged. None existed. And the Board and Ms. Garrett knew this." Compl., ¶ 22. Although the termination memorandum claims that Mr. Morgan's speech had "adversely impacted [his] ability to successfully perform [his] job," Mr. Russ Willis, Deputy Chief Disciplinary Counsel for the Board, specifically told the Chancery Court of Davidson County otherwise on the same day stating in the Board's response to the Motion to Disqualify:

> "Mr. Manookian has neither alleged nor produced any statement, pleading or conduct by the undersigned Disciplinary Counsel or any counsel employed by the Board, demonstrating or suggesting this disciplinary action has been influenced by bigotry, race, religion or other arbitrary classification." (Compl., ¶ 24, Ex. B.)

The Board, in the same brief, argued that disqualification of counsel was "a drastic remedy and is ordinarily unjustified based solely on an appearance of impropriety." (Compl. ¶ 24). Yet Ms. Garrett concluded that appearances which were insufficient to have disqualified Mr. Morgan from representing the Board in the Manookian case were somehow sufficient to justify his termination, which Manookian had not sought.

The termination memorandum made a vague reference to "another attorney facing disciplinary action" having "question(ed)" his recommendations to the Board. The Board's response to this was not provided, nor was the vague "question" explained. It would not be surprising for a lawyer facing loss of his license to be resentful and attack a lawyer for the Board, using the same tactics of Mr. Manookian. Ms. Garrett, her predecessors, and Mr. Willis, along with other Disciplinary Counsel, have all been targets of motions to disqualify and independent lawsuits filed by disciplined attorneys, or those facing discipline.

The Board's actions in wrongfully terminating Mr. Morgan have actually provided a roadmap for such disgruntled attorneys. As can be clearly seen from the Board's wrongful termination: the important thing to the Board was *not* the actual facts, but the *publicity surrounding the accusation*. Any frustrated attorney facing discipline will be able to walk the same road, without regard to actual wrongdoing or bias, but simply based on making public accusations, however irrelevant to their disciplinary matter.

Surely Ms. Garrett does not wish to weaponize such behavior by attorneys already accused of misconduct to interfere with her ability to hire and supervise competent counsel. But this wrongful termination has done just that. In fact, shortly after Mr. Morgan's wrongful termination, Russ Willis, the Board's Deputy Chief Disciplinary Counsel, himself became the target of another

motion to disqualify filed in the same appeal by Mr. Manookian, who was no doubt emboldened by the unexpected success of his public campaign against the Board and Mr. Morgan.

A reasonable public official would have known that the First Amendment is entitled to special protection and that the *Bennett* case was clearly distinguishable. A reasonable public official would have known that the Board's reputation is subjective. Neither the Board nor Ms. Garrett make an argument that the Board's reputation was impugned. To terminate based on nothing more than an accusation simply cannot be justified.

Mr. Morgan's constitutional right to free expression of opinions on matters of public concern was clearly established.

## IV.    INJUNCTIVE RELIEF AGAINST MS. GARRETT

Finally, Ms. Garrett argues that Mr. Morgan is not entitled to injunctive relief against Ms. Garrett, as any injunctive relief "could only be done by Defendant Garrett acting in her official capacity as Chief Disciplinary Counsel of the Board, not as an individual." Further, Ms. Garrett contends that because the disciplinary file has been dismissed, injunctive relief is moot.

On the contrary, as the baseless disciplinary file has been dismissed, there is no longer any need to apply quasi-judicial immunity arguments to it. Instead, Mr. Morgan has simply requested an order from this Court enjoining Ms. Garrett from re-opening the disciplinary file, as Tenn. Sup. Ct. R. 9 does not seem to prohibit doing so. Mr. Morgan has further requested this Court to order Ms. Garrett to expunge his "disciplinary file" from the Board's internal computer systems, as it was wholly without merit and opened as retaliation against Mr. Morgan.

There are, of course, a number of disciplinary files that are opened in order to precipitate an investigation which are thereafter dismissed as the investigation itself reveals no misconduct. Computer systems demonstrating the existence of those files are appropriate. In Mr. Morgan's

case, however, the "investigation" of his employment was done completely outside the scope of a disciplinary file, because there was never a complaint filed against him, nor was there ever any allegations of wrongdoing on his part. Accordingly, there was simply no need to open a baseless disciplinary file at all in March 2021, as all of the information was known by that point, and the Board and Ms. Garrett had unequivocally acknowledged that Mr. Morgan had not committed any misconduct, and that there were no *allegations* against him otherwise.

Consequently, the opening of a disciplinary file was outside of Ms. Garrett's scope as Chief Disciplinary Counsel. It appears to have been retaliation against Mr. Morgan, or perhaps an effort to shield herself with quasi-judicial immunity when none existed. In either event, the Board and Ms. Garrett were wholly without jurisdiction to open up such a baseless disciplinary file against Mr. Morgan, and the same should be expunged from the Board's internal system.

Ms. Garrett should be enjoined from making any claims to any third parties that Mr. Morgan was terminated as a "bigot." Far from being moot, this wrongful termination has had a drastic negative impact on Mr. Morgan's reputation as an attorney.

## **CONCLUSION**

For the reasons stated above, the Board is not entitled to Eleventh Amendment immunity, and Ms. Garrett is not entitled to either quasi-judicial or qualified immunity. Plaintiff respectfully requests that this Court enter an order DENYING the motion to dismiss.

Respectfully submitted,

THE BLACKBURN FIRM, PLLC


/s/ W. Gary Blackburn
W. Gary Blackburn (#3484)
213 5ᵗʰ Ave. North, Suite 300
Nashville, TN 37219
Telephone:  (615) 254-7770
Email: wgaryblackburn@wgaryblackburn.com

## CERTIFICATE OF SERVICE

I hereby certify that on June 7, 2021, a copy of the foregoing document was filed electronically.  Notice of this filing will be sent via the Court's ECF system to:

David M. Rudolph, Esq.
Assistant Attorney General
Office of the Attorney General and Reporter
40 South Main Street, Suite 1014
Memphis, TN 38103-1877
David.rudolph@ag.tn.gov
Attorneys for Defendants


/s/ W. Gary Blackburn
W. Gary Blackburn